J-S42005-24

2024 PA Super 308

IN RE: NAME CHANGE OF L.L.N., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
APPEAL OF: T.N., FATHER : 
:
:
:
:
:
: No. 523 MDA 2024

Appeal from the Order Entered March 28, 2024
In the Court of Common Pleas of Cumberland County Civil Division at
No(s): 2023-09468

BEFORE: LAZARUS, P.J., BECK, J., and BENDER, P.J.E.

OPINION BY LAZARUS, P.J.: **FILED: DECEMBER 23, 2024**

T.N. ("Father") appeals from the order, entered in the Court of Common Pleas of Cumberland County, granting the petition filed by N.K. ("Mother") to change the surname of the parties' minor child, L.L.N. ("Child"). After review, we affirm.

The trial court set forth the factual and procedural history of this case as follows:

> [Child] was born [in May 2020,] during the marriage of [the parties, who] divorced on December 19, 2022[. Mother] resumed using her prior surname of K[.], and [] desire[d] to change the name of [Child] from L.L.N. to L.L.K. for the following reasons: [(1) Father has not had contact with Child since shortly before her first birthday, in May 2021; (2) Father has been convicted of multiple counts of DUI as well as harassment, is currently in prison, and will not be released from prison until November 2026, at the earliest; (3) Father is precluded from having contact with Mother as a condition of his probationary sentence for harassment; (4) Mother desires to protect Child from any stigma and/or emotional or psychological trauma that may result from having Father's last name while living in the same community in

which he committed the above crimes; and (5) Mother desires to share the same last name with Child, as well as to have Child share the same last name with her 8-year-old half-brother.]

. . .

[Father filed a response to Mother's petition.] While [Father] does not deny his record of criminal convictions as alleged by [Mother], he does note that[, due to a correction in one of his sentencing orders, he "]should be released from SCI not later than November 2025." [Father] also alleges that [Mother] ["]has been shamelessly alienating [] Child from [him] long before Father ever pled guilty to DUI and began serving his sentence for it. [Mother] is apparently using this name change petition as part of her ongoing and stubborn attempt to [a]lienate [] Child from [] Father.["]

In this regard, [Father] alleges that he "enjoyed bi-weekly visits [with Child] prior to his reporting to SCI for the incarceration portion of his sentence," pursuant to a court order prompted by [Mother's] attempts to alienate [C]hild from him, which included a false claim of harassment when he "attempted to contact or visit his Child" and ["]frivolous["] protection from abuse petitions that "were subsequently dismissed by the Court." He also alleges that "[t]he Child is the subject/recipient of court[-]ordered support from [him], and she is a beneficiary of the [N.] estate."

[A] hearing on [Mother's] petition for change of name was held by the court on March 15, 2024. At this proceeding, [Mother] presented [her own] testimony[, as well as that of K.F.,] an adult son of [Father] by another relationship, and secured the admission of eight exhibits; [Father] presented [his own] testimony[.]

[Mother's testimony] may be summarized as follows: [h]er name is [N.K.], which was her given name at birth, her residence is in Cumberland County, Pennsylvania, and she has two children, J.K., who was born [in] June [] 2015, and bears [Mother's] surname [], and L.L.N., the subject of the petition, who [] bears the surname of [F]ather. [Mother] and [Father] separated in November of 2021,[1] and his contact and relationship with [C]hild thereafter

_____

[1] It appears that Mother may have misspoken when she testified that she and Father separated in November 2021. Father filed a custody complaint in February 2021 and the parties agree that Father last saw Child in May 2021. Thus, it would appear that the separation likely occurred in November 2020.

was negligible, consisting of one or two supervised visits pursuant to a custody order in a case that he ultimately chose not to pursue, the last of which visits was on May 8, 2021.

[Mother testified that Child] is known at the day care she attends by [Mother's] surname, and [C]hild does not in fact know [F]ather. [Mother believes that C]hild's use of [Mother's] surname [is in Child's] best interest because of the stigma attached in the community to [Father's] name, with the attendant prospect of ridicule, embarrassment, discrimination, and bullying [] associated with it.

[At the hearing, Mother presented two news articles that were returned in a Google search of "[Father's name] Mechanicsburg, Pennsylvania." The articles, from the York Daily Record and FOX43 websites, detailed an incident in which Father was "found sleeping half-naked in his car at a Rutter's store" and offered an investigating officer $50 instead of his license. The articles indicate that Father was charged with DUI, indecent exposure, open lewdness, and other related charges.]

[K.N.] also testified in support of [Mother's] petition. He stated that[:] he is the 19-year-old son of [Father;] he last saw his father when he was eleven or twelve years old[;] he was raised by an aunt and uncle in Beverly, New Jersey[;] he is currently a college student in Atlantic City, New Jersey[;] and [] he visits [Child] every two or three months. When [K.N.] was a freshman in high school[,] a classmate discovered, through a Google search utilizing the [N.] name, [one of] the article[s] referenced above, head[lin]ed "Man with pants down offers cop money, police say," containing his father's mug shot, and it [] caused [K.N.] embarrassment[. K.N. testified that he considered changing his last name but decided against it after re-establishing a relationship with his paternal grandparents. K.N. testified that he realized it would upset his grandfather, as K.N. is his only biological grandson with his last name. Finally, K.N. expressed his opinion that Child should not bear Father's last name.]

[Father] testified [] in opposition to the petition. He stated that he will be eligible for parole on November 14, 2025, and that he is by trade a master plumber and certified HVAC technician. Following his separation from [Mother], he was denied contact with [Child] by [Mother], as a result of which, and in spite of repeated efforts on his part to obtain [Mother's] voluntary cooperation that unfortunately led to a harassment conviction, he

had no choice but to initiate a custody action to secure his parental rights with respect to [Child].

[Father] testified that[,] ultimately[,] an order was entered granting him rights to supervised visitation, that initially he exercised his rights under the order every two weeks, that duties in connection with the administration of the estate of his mother then absented him from Pennsylvania from a point in June of 2021 to a point in August of 2021, [which], upon his return, resulted in a period [of] incarceration on a technical violation. Upon his release from prison at that time, [] supervised visitation arrangements were made for him through the offices of the Harrisburg YWCA, but the first such visit did not occur due to his tardiness[. Mother] failed to appear at a rescheduled session because "her son was getting a haircut," and that visit had been his last opportunity to see [C]hild before his current incarceration. The result of the foregoing events, according to [Father's] testimony, was that his last contact with [C]hild [] occurred on May 31, 2021.

[Father] testified that he "want[s] to be involved in [Child's] life" following his release from prison, and that he intends to pursue the custody litigation to enforce his custodial rights at that time.

Trial Court Opinion, 3/28/24, at 1-6 (citations to record and emphasis omitted; formatting altered).

Following the hearing, and after reviewing the custody record, on March 28, 2024, the trial court entered an order granting Mother's petition and changing Child's surname to Mother's maiden name. Father filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He now raises the following claims for our consideration:

1. Did the trial court abuse its discretion and commit reversible error(s) of law by concluding Father had a "minimal relationship" with [C]hild despite well[-]documented alienation by Mother in the collateral custody case[?]

2. Did the trial court abuse its discretion and commit reversible error(s) of law by concluding there was sufficient "stigma" attached to [Father's] family name [] to justify taking that name from [C]hild?

3. Did the trial court abuse its discretion and commit reversible error(s) of law by disregard[ing] the [rules] of evidence to improperly base its decision upon unauthenticated hearsay stories from the [i]nternet?

Brief of Appellant, at 6 (reordered for ease of disposition).

Father's first two claims challenge the trial court's conclusions in support of its decision to grant Mother's name-change petition. First, Father asserts that the court incorrectly found that Father's relationship with Child was "minimal." Father claims that the record in the parties' custody matter—of which the trial court took judicial notice, but which is not contained in the certified record on appeal—demonstrates that "Mother did everything possible to alienate Father" from Child prior to his imprisonment and then "quickly filed her [name-change petition] so that Father would be forced to oppose it from jail." *Id.* at 7, 8. Conversely, Father claims he did "everything in his power to maintain his relationship with [Child]." *Id.* at 8. Father argues that "the record [in this matter] reflects an attempt by the trial court to impose its own views upon the litigants[,] as opposed to a genuine determination of what would best suit [Child] and all concerned." *Id.* at 8.

Father also argues that the trial court's conclusion regarding the possible stigma attached to his surname was "speculation," unsupported by expert opinion or any other evidence. *Id.* at 13. Father alleges that Mother's "unseemly stunt" of presenting the testimony of his grown son, K.N., "appears

to have backfired" because K.N., who retained Father's name after discussing it with his paternal grandfather, testified that "there[ are] some pros and cons" associated with keeping his family name, thus undercutting Mother's "histrionic suggestion of psychological trauma." *Id.* at 13-14. Finally, Father argues that the trial court committed reversible error by "presum[ing] the family name . . . will cause [Child] to experience any social stigma, much less any psychological harm." *Id.* at 15. We conclude that none of these arguments affords Father any relief.

The appellate standard of review involving a petition for change of name is whether or not there was an abuse of discretion. *See In re Change of Name of Zachary Thomas Andrew Grimes to Zachary Thomas Andrew Grimes–Palaia*, 609 A.2d 158, 159, n.1 (Pa. 1992). An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill-will. *See Steltz v. Meyers*, 265 A.3d 335, 347 (Pa. Super. 2021).

When considering a petition to change the name of a minor child, the best interests of the child should be the standard by which a trial court exercises its discretion. *See In re Grimes*, 609 A.2d at 161. This Court has further held:

> the party petitioning for the minor child's change of name has the burden of coming forward with evidence that the name change requested would be in the child's best interest[s], and that where a petition to change a child's name is contested, the court must carefully evaluate all of the relevant factual circumstances to

determine if the petitioning parent has established that the change is in the child's best interest[s].

***In re: C.R.C.***, 819 A.2d 558, 560 (Pa. Super. 2003).

Our Supreme Court has set forth the considerations relevant to a child's best interests in the context of a name change petition:

Specific guidelines [for a child's best interests] are difficult to establish, for the circumstances in each case will be unique, as each child has individual physical, intellectual, moral, social[,] and spiritual needs. However, general considerations should include the natural bonds between parent and child, the social stigma or respect afforded a particular name within the community, and, where the child is of sufficient age, whether the child intellectually and rationally understands the significance of changing his or her name.

***In re E.M.L.***, 19 A.3d 1068, 1071 (Pa. Super. 2011) (citations omitted).

We begin by noting that the basis for Father's first claim—the record in the parties' custody matter—is not contained in the certified record on appeal. We note the well-established principle that "our review is limited to those facts which are contained in the certified record and what is not contained in the certified record does not exist for purposes of our review." ***Commonwealth v.*** [***Gregory***] ***Brown***, 161 A.3d 960, 968 (Pa. Super. 2017).[2] Because

_____

[2] However, we also recognize that, as this Court reiterated in ***Commonwealth v. Holston***, 211 A.3d 1264 (Pa. Super. 2019) (en banc), "in certain circumstances, we may consider an item included in the reproduced record that has been omitted from the certified record. Specifically, where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it." ***Id.*** at 1276 (citations omitted). ***See also*** Pa.R.A.P. 1921, note, citing ***Commonwealth v.*** [***Dwayne***] ***Brown***, 52 A.3d 1139, 1145 n.4 (Pa. 2012) (stating "where the accuracy of a pertinent document is undisputed, the Court could consider that document if it was in the [r]eproduced [r]ecord, even though it was not in the record that had been

*(Footnote Continued Next Page)*

- 7 -

Father's argument as to his first claim is based on documents not before this Court, we could deem the claim waived. However, as the trial court had the opportunity to review the record and summarized it for our benefit in its opinion, we decline to find waiver. Nevertheless, Father is entitled to no relief.

Here, the record supports the court's decision to grant Mother's name-change petition. The court made credibility determinations—supplemented by its review of the custody record—and concluded that Child's best interests would be best served by a name change where: (1) Father's contact with Child has been extremely limited;[3] (2) Child would likely not recognize Father; (3) Father has not had any contact with Child since his most recent incarceration in 2022; (4) Child knows her name to be L.L.K. and her daycare providers refer to her as such; (5) Child would benefit by sharing a last name with the family with whom she resides and interacts; and (6) there is a stigma attached to Father's name as a result of publicity surrounding his legal issues. We can discern no abuse of discretion.

Moreover, Father's argument that K.N.'s testimony undercut Mother's "stigma" argument is based on a mischaracterization of K.N.'s testimony.

_____

transmitted to the Court"). However, Father failed to include any portion of the custody record in his reproduced record submitted to this Court.

[3] The trial court noted that "[n]othing in the court's opinion suggests that Father does not desire a relationship with [Child]; however, to date, he has conducted himself in such a manner that has consistently impeded the growth or maintenance of that relationship." Pa.R.A.P. 1925(a) Opinion, 5/30/24, at 2 (unnecessary capitalization omitted).

K.N.[4] testified that, although he suffered embarrassment when his friend found the article about Father "handing a cop a $50 [] bill while in a gas station parking lot," N.T. Hearing, 3/15/24, at 58, he decided that he would retain his family name for the sake of his paternal grandfather, with whom he had reestablished a close relationship. *See id.* (K.N. testifying he and paternal grandfather "discussed that[] I'm his only [] biological grandson with his last name; and I could tell from[] that conversation with him that it would upset him if I were to [] change my last name"). However, K.N. testified that he did not believe that Child should keep Father's name because the internet makes it very easy for people to uncover Father's history. *See id.* at 59 ("Q: So[,] would you recommend that [Child] have a different last name? A: Yes."). K.N. testified:

> I just feel as though, for her, if the name was changed at a younger age, it's easy for her to kind of not feel attached to it, not feel that embarrassment if it comes up. Whereas for me, that embarrassment didn't really come up until my freshman year of high school where I already—everybody associated with me knew me as my last name; and now that the article had come to surface, it's kind of a thing that's attached to me because that's my last name. It's his last name. But I feel as though if it's changed at her age now, she's not going to have that attachment to it.

*Id.* at 60.

On K.N.'s cross-examination, the following exchange occurred:

---

[4] K.N., who was 19 years old at the time of the hearing, testified that he had not seen Father regularly since he was 5 years old and that he last spent time with Father when K.N. was 11 or 12 years old. *See* N.T. Hearing, 3/15/24, at 56-57.

Q: You decided to keep [your surname the same]?

A: Yes.

Q: And you said there[ are] some pros and cons with that? My words, pros and cons.

A: Yes.

Q: One of the pros is you have an established relationship with [Father's family]. That's a pro?

A: Yes.

. . .

Q: You doing okay?

A: Okay as in?

Q: In life generally?

A: I'm doing great.

Q: Ok. And your last name's [Father's surname]?

A: Yes. But **I don't feel as though that has anything to do with how I'm doing as far as my pros**.

*Id.* at 61-62 (emphasis added).

As K.N.'s testimony made clear, his decision to keep his birth surname had nothing to do with any attachment to Father, but rather was based on his strong relationship with his paternal grandfather, as well as the fact that everyone in his life already associates him with Father's surname and it would be fruitless to change it at this juncture.

Finally, as the trial court astutely noted, "it must be remembered that a parent's goal 'to forge a strong and nurturing relationship with [his child]' is not dependent upon an identity of their surnames, inasmuch as 'redress for visitation and custodial rights' is separately available through the courts."

Trial Court Opinion, 3/28/24, at 8, quoting *In re C.R.C.*, 819 A.2d at 563.

Should Father genuinely wish to pursue a relationship with Child in the future,

a name change would have no impact on his ability to do so.

Lastly, Father asserts that the trial court abused its discretion by

disregarding the rules of evidence by admitting—and improperly basing its

decision on—unauthenticated hearsay stories from the Internet. Father

argues that the court admitted

> several pages of material which [] Mother represented as being that which she herself obtained with a simple internet search of Father's name. However, this was a ruse. Mother intended to represent that she simply typed in Father's name—all by herself—and the [i]nternet spat out the stories about Father's DUI arrest. She held the stories and other materials in her hand in court and swore that she had done this herself. This was intended to convince the court that this "stigma" material was also waiting to similarly jump out of the [i]nternet at [Child] when [Child] grew older, for example. This alleged misrepresentation was clearly exposed during cross[-]examination of Mother. She eventually confessed that her counsel had done the computer research at her law office and then gave her the material at the hearing to claim in court as her own product. Her counsel did not testify about this event.

Brief of Appellant, at 9.

Father argues that Mother had no personal knowledge of the truth of

any of the stories and that they were not properly authenticated, as required

by Pa.R.E. 901. Father asserts that the trial court improperly relied upon the

"highly prejudicial and inadmissible content" in order to decide the case." *Id.*

at 10. Father alleges that "[t]he scorned Mother, and the [trial court], both

seem to gloat over and exaggerate this single issue about Father's DUI arrest

in 2017," with "the trial court highlight[ing] in **bold** that [Father's surname] is referenced in the alleged [i]nternet article as 'Man with pants down offers cop money, police say.'" ***Id.*** (emphasis in original). Father is entitled to no relief.

We begin by noting our disapproval with the tone of Father's argument. Among other things,[5] his reference to Mother as "scorned" and his accusation that both Mother and the trial court "gloat[ed] over" Father's 2017 arrest are inappropriate, hyperbolic, and not supported by the record. Moreover, Father once again mischaracterizes testimony adduced at the hearing. In an apparent attempt to discredit both Mother and the information discovered through the Google searches, Father claims that Mother perjured herself by testifying that she, herself, printed out the internet search results presented at the hearing. This claim is utterly belied by the record.[6] Our review of the

---

[5] Father also characterized Mother's entirely appropriate use of K.N.'s testimony as an "unseemly stunt" and referred to her argument that Child could be stigmatized by her association with Father's name as "histrionic." ***See*** Brief of Appellant, at 13-14.

[6] The trial court itself felt compelled to note, on the record, Father's counsel's misrepresentation of Mother's testimony:

> MR. LAGUNA: [] We still don't know who did the Google search. I thought the attorney did it based on what the witness said, and now the attorney is saying she doesn't know who did it because she just was handed them today.

> THE COURT: She didn't say anything of that—anything close to that. **I can't even comprehend how much you**

*(Footnote Continued Next Page)*

transcript indicates that Mother testified to having performed Google searches of Father's name and further testified that the printouts of Google search results and news articles submitted as exhibits at the hearing were accurate representations of the results she received. Under questioning from Father's counsel, Mother testified that she had not, in fact, printed out the search results, but rather her lawyer had done so. At no time did Mother state that she had physically printed out the search results and articles that were submitted as evidence.

In any case, it is of no moment whether the articles were physically printed out by Mother or her counsel.[7] Pennsylvania Rule of Evidence 902(6) provides that "[m]aterial purporting to be a newspaper or periodical" are "self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted[.]" Pa.R.E. 902(6). Rule 902(6)

_____

**mischaracterize statements that are being made** by both the witness and now counsel. That is not what she said.

N.T. Hearing, 3/15/24, at 22-23 (emphasis added).

[7] The trial court noted the following during Father's counsel's cross-examination of Mother regarding who performed the Google searches and printed out the articles:

THE COURT: This is just going down a rabbit hole that doesn't make any sense. [Mother] did the Google searches. She did not print 5, 6, and 8; but when she did the Google search, she saw those same results. I don't care that her attorney is the one who printed them if that's what you're getting at.

N.T. Hearing, 3/15/24, at 21.

permits both printed and digital newspapers and periodicals to be self-authenticated. Evidence purported to be an article or item from a newspaper or periodical must contain sufficient indicia of its original publication, including, but not limited to, the publication's title; the date of publication; page or volume of the article or item, if the content appeared in print; and web address, if applicable, where the article or item was originally published.

Pa.R.E.902(6), Comment.

Here, Father complains of two internet exhibits submitted by Mother at the hearing. The first is a printout of an article from the FOX43 website entitled "Mechanicsburg man found sleeping, drunk at Rutter's tries to hand officer $50 for identification." *See* Petitioner's Exhibit 6. The printout contains the author of the article, the date and time of publication, and the web address at which the article can be found. The second exhibit is a screenshot of an article from the *York Daily Record* published online with the headline "Man with pants down offers cop money, police say," as well as a subheadline reading "[Father] faces several charges, including indecent exposure." *See* Petitioner's Exhibit 8. The copy of the screenshot contained in the record, while difficult to read clearly, contains the author's name and email address, the date and time of publishing, and the article's web address. Thus, it is clear that both exhibits "contain sufficient indicia of [their] original publication" such that they are self-authenticating under Rule 902(6).[8]

_____

[8] We note that this Court performed a Google search with the terms testified to by Mother and received results identical to those depicted in the complained-of exhibits.

To the extent that Father argues that the articles constitute hearsay, we conclude that this claim is waived. Father's entire argument on that topic consists of the following bald statement:

Aside from admitting improperly/falsely authenticated material, it was error to consider the hearsay statements contained withing [sic] the material. Mother testified that she had no personal knowledge of the truth of any story or the authors, etc.

Brief of Appellant, at 10. Father cites to no rule of evidence or case law in support of his hearsay claim, nor does he engage in any legal analysis. As Father has failed to develop any legal argument whatsoever, he has waived this claim.[9] *See Commonwealth v. Clayton*, 816 A.2d 217 (Pa. 2002) ("[I]t

---

[9] Even if Father had not waived his hearsay claim, we would find it to be meritless. "To constitute hearsay, a statement first must be uttered out-of-court, and then it must be offered in court for the truth of the matter asserted in the statement." *Commonwealth v. Fitzpatrick*, 255 A.3d 452, 458 (Pa. 2021). However, "if the statement is intended to be used for some purpose other than establishing its truth—i.e., to show the effect that the statement had on the listener []—then it would not be hearsay and, consequently, would be admissible for that non-truth purpose, subject to any other applicable evidentiary rules." *Id.* Here, Mother offered the articles not to prove the truth of the matter asserted—that Father was sleeping in a car while drunk with his pants down and offered a police officer money—but, rather, to show the effect of the articles on someone who reads them. Specifically, Mother sought to demonstrate that, because the articles existed online for anyone to read at any time, Child would be likely to suffer humiliation and embarrassment were she, or someone she knew, to read them. As the trial court aptly noted in its Rule 1925(a) opinion:

The utility of the exhibit[s] . . . was to demonstrate what someone would find if they searched Father's name. Unlike a child pornography case, as referenced by Father's attorney, the purpose for admitting the exhibit was not to prove who completed a particular search, but rather to prove what could be found if anyone did such a Google search. This [c]ourt found it highly

*(Footnote Continued Next Page)*

is a well settled principle of appellate jurisprudence that undeveloped claims are waived and unreviewable on appeal.").

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/23/2024

---

relevant to the issue of stigma that the same or very similar results were discovered not only by Mother and her attorney, but also by [K.N.] several years earlier.  **Whether the content of the articles is true or misleading is irrelevant to the [c]ourt's decision to grant the name change**.  The fact that articles exist and are easily obtainable on the internet is probative to a determination that there is a degree of stigma associated with Father's name.

Pa.R.A.P. 1925(a) Opinion, 5/30/24, at 4-5 (emphasis added).